NOT DESIGNATED FOR PUBLICATION

No. 119,120

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of
RAJAT BARUA,
*Appellee*,

and

LINDA HAMIDJAJA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; NEIL B. FOTH, judge. Opinion filed July 26, 2019. Affirmed.

*Joseph W. Booth*, of Lenexa, for appellant.

*Patrick Copley*, of Overland Park, for appellee.

Before SCHROEDER, P.J., GREEN and POWELL, JJ.

PER CURIAM:  Rajat Barua (Father) and Linda Hamidjaja (Mother) divorced in 2015. After the divorce they shared custody of their daughter S.B. In 2017, Mother moved the district court for an order allowing her to move S.B. with her to the state of California. The district court denied Mother's motion. Mother appeals, raising multiple arguments. For reasons set forth below, we affirm the district court.

Mother and Father married in September 2010. They are both doctors. Their daughter, S.B., was born in 2011. Father filed for divorce in April 2013. The divorce was finalized in April 2015. Mother and Father retained joint legal custody of S.B.; Mother

1

had primary residential custody. The divorce order incorporated a stipulated parenting plan that gave both Mother and Father residential time with S.B. Both Mother and Father continued to live in Johnson County after the divorce. Mother's parents, the Maternal Grandmother and Grandfather, live with her. Father's mother, the Paternal Grandmother, lives with him.

In January 2017, Father filed a "Motion to Modify Parenting Plan and . . . Enforce Co-parenting Therapy Provision of Parties' Decree of Divorce." Mother responded, asking that the district court dismiss Father's motion.

In March 2017, the district court reappointed Christopher Reecht as S.B.'s Guardian Ad Litem (GAL). Reecht previously served as S.B.'s GAL during Mother's and Father's divorce litigation. The order reappointing Reecht included a clause stating:  "The parties agree to waive any ex-parte communications between the Guardian Ad Litem and the Court. Counsel for the parties agrees to allow the Guardian Ad Litem to have direct contact/communications with their client(s)."

On July 12, 2017, Father moved for an "Order Commanding Mother to Not Move Out of State with the Parties' Minor Daughter." Mother opposed this motion, arguing that she did not intend to move without first receiving a court order allowing her to do so. On August 4, 2017, the district court denied Father's motion; it found no indication that Mother intended to move without giving appropriate written notice.

On August 21, 2017, Mother moved to "Modify Child Custody, Parenting Time and for an Order Allowing Respondent and the Minor Children [*sic*] to Relocate." Mother explained that she received a job offer in the Los Angeles, California, area, she had purchased a house there as well. She sought the court's permission to move S.B. with her to California and amend the parenting plan so that Father's parenting time was primarily over long holidays and summer breaks, as well as occasional weekends. Mother argued

2

that this was a better arrangement for S.B. than the current plan that required S.B. to transition between Mother's and Father's homes multiple times per week. Mother argued that she and S.B. had more family and friends in Los Angeles than in Johnson County, Kansas, that S.B. would attend better schools in California, and that S.B. would enjoy greater exposure to her family's Asian cultures in Los Angeles. Further, Mother alleged that S.B. was afraid of Father and was not well bonded to him. Moreover, she asserted that Father and the Paternal Grandmother were abusive.

Father opposed Mother's motion. The district court held a series of hearings on the motions in September 2017.

At the September 12, 2017 hearing, the Paternal Grandmother, the Maternal Grandmother, the Maternal Grandfather, and the director of the Kansas Board of Healing Arts, Kathleen Selzler Lippert, testified.

The Paternal Grandmother testified that S.B. had a good relationship with her as well as with Father. She testified that in 2015, DCF investigated allegations that she had abused S.B., but that DCF found no abuse. She further testified that before Mother and Father divorced, she had observed Mother hit Father. She also stated that she thought Mother told S.B. lies to discourage S.B. from feeling close to her Father and her.

The Maternal Grandfather testified that a move to Los Angeles would be beneficial for S.B. because she has extended family in the area. He stated that when Father came to pick S.B. up from Mother's home, Father would be angry and have a temper "about 75 percent" of the time. He further stated that often S.B. did not want to go with Father. He also testified that S.B. complained that her Paternal Grandmother yanked her ear, spanked her, or hit her. He stated that S.B. was afraid of Father and her Paternal Grandmother. He stated that Father did not ensure S.B. bathed and practiced good

3

hygiene while in his care. He testified that with the frequent custody changes under the current custody plan, S.B. was often tired at school.

The Maternal Grandmother testified that Mother's boyfriend lived with the family for about a year before breaking up in the spring of 2017. She testified that S.B. often had nightmares after she came back from Father's house. She testified that S.B. complained about her Paternal Grandmother hitting her and pulling her ear as punishment.

Selzler Lippert testified that as of September 5, 2017, Mother had not applied for a license to practice medicine in Kansas. She stated that once an applicant has submitted all the necessary materials to apply for a medical license, it usually takes the Board about three to seven days to issue the license. She testified that being board certified was not a requirement for medical licensure. She stated that it can take two months or more for applicants to complete their application, however, because they have to submit a substantial amount of documentation.

The next day, Father testified, as did S.B.'s therapist, Elizabeth Miranda. Father stated that the current plan required him to pick up S.B. from Mother's house and that S.B. was frequently not ready on time. He testified that Mother unilaterally decided what activities S.B. could participate in and kept him from being listed as an authorized parental contact at S.B.'s school. He stated that Mother tried to isolate him from S.B. as much as possible. He pointed out that he accommodated Mother's requests, for example, by allowing S.B. to attend a Chinese school on Sundays that cut into his parenting time. He further testified that Mother accused him of trying to kidnap S.B., even when he was abiding by the confines of the parenting plan. He stated that his relationship with S.B. was "excellent." He also testified that neither he nor his mother ever abused S.B. He proposed that an "every-other-day parenting schedule" was in S.B.'s best interests.

Father maintained that if S.B. were to move to California with her mother, his relationship with his daughter would suffer. He testified that the move was not in S.B.'s best interests because she would miss out on the bond with him and her Paternal Grandmother. He admitted that he made enough money to afford to travel to California to visit S.B. He admitted that he had not exercised all of his parenting time under the current plan, but he explained that was because he tried to compromise with Mother and accommodate her requests for activities and parenting time. He admitted that he never met with S.B.'s therapist between 2013 and 2017, and that the full extent of his communication with the therapist was four or five e-mails.

Miranda testified that she served as S.B.'s therapist from 2013 until the time of the hearing with about a year-long gap for most of 2014. She testified that she introduced herself to Father via e-mail in 2013 but that she did not hear anything from Father until he e-mailed her in June 2015. She stated that she met with Father in June 2015 to discuss concerns about how to handle S.B.'s transitions from one parent's home to the other with as little stress for S.B. as possible. She testified she next met with Father in May 2017 to discuss Father's concerns that the GAL had spoken with her and to address purported concerns about his mother's relationship with S.B. She testified that Father also e-mailed her again in December 2015 expressing concerns about parental alienation by Mother. Finally, she stated that although she had reached out to Father about doing joint therapy sessions with S.B., Father did not do so until the week before the hearings.

Miranda testified that she called the DCF hotline in 2015 because S.B. had expressed that her Paternal Grandmother yelled at her, hit her, and pulled her hair, but that Father protected her. Miranda testified that at times, S.B. confided that she thought her Paternal Grandmother was grumpy or mean and that "daddy [didn't] like [S.B.]" Nevertheless, Miranda testified that as S.B. got older, her perspective shifted and she began to say things like "daddy is nice." She testified that Mother and Father engaged in significant conflict during transitions, and this caused anxiety for S.B. She testified that

5

as recently as the summer of 2017, S.B. indicated that she felt happy and loved at Mother's home, but she was scared at Father's home. She also stated that S.B. "does not like going back and forth" between her parents' homes and "does not like going to daddy's house." Miranda testified that S.B. expressed excitement about the possible move to California, in part because she thought she would no longer have to go back and forth between Mother and Father.

On September 28, 2017, Mother took the stand. Mother testified that S.B. is strongly bonded with her. She stated that when she first came to the United States in 2004, she lived in Los Angeles for three and a half years and she still had family and friends in the area. She testified that she frequently attended S.B.'s school events and extracurricular activities, and that Father rarely did. She stated that Father frequently missed large blocks of his parenting time because he traveled internationally. She testified that beginning in the spring of 2016, Father requested that Mother cede her parenting time to him and threatened to not allow S.B. to participate in Chinese school unless she did so.

Mother's proposed move was animated largely by the prospect of a new and better paying job in California. Until April 2017, Mother worked at the Leavenworth VA Hospital; Mother lost that job because she was not a citizen. Mother testified that she did try to keep working at the VA so that she could stay in Kansas. Nevertheless, the only option she was given was to work in Topeka with a schedule that would barely allow her to see S.B. She stated that many other local jobs required board certification, which she did not have. She testified that she was moving to California for a job opportunity and a stronger support system of friends and family. Mother admitted that she did take S.B. to see the house she purchased in California before obtaining permission to move S.B. to California.

6

Mother stated she believed that moving to California would help alleviate S.B.'s stress and the physical symptoms of her stress like her eczema. Specifically, Mother testified that a parenting plan with longer periods of time with each parent and fewer transitions would be better for S.B. Mother argued that even if S.B. moved to California, Father would still enjoy about the same amount of parenting time that he did under the current plan. She also testified that the city she wanted to move to has a better school district than the one S.B. currently attended.

Mother also requested an amendment to the parenting plan such that the Paternal Grandmother could not be left alone with S.B.; Mother stated that this was necessary because the Paternal Grandmother inappropriately used physical discipline.

During cross-examination, Father's attorney highlighted that Mother, not S.B., was the first person to tell Miranda about the alleged abuse. The attorney also sought to cast doubt on her allegations of abuse toward S.B. by pointing out that despite her concerns, Mother continued to allow S.B. to go to Father's house for his parenting time. Mother admitted that she never told Father that her ex-boyfriend lived with her for about a year, even though the ex-boyfriend lived in the house when S.B. was there. Father's attorney suggested that Mother wanted to move to California because her ex-boyfriend lived in California and his family lived in Los Angeles; Mother denied this.

When S.B.'s GAL questioned Mother, she stated that if the judge denied her request to move with S.B., she would try to stay in Kansas but was not sure if she could make it work jobwise.

During closing, the GAL stated that, were the court to decide only on Father's motion for evenly divided parenting time, he would recommend against it. The GAL stated that under the law, the judge should consider five factors to determine if he should grant Mother's motion to move to California with S.B.

The first factor was the potential impact of the move on S.B.'s "emotional, physical, or developmental needs." The GAL stated that S.B. had a clear desire to stay with Mother, not Father. The GAL stated that "Father had been more of a parent of convenience, less of an involved parent." He pointed out that S.B. was not really bonded with Father. The GAL also stated that Mother would make more money at the job in California which would provide a "trickle-down advantage" for S.B.

The second factor was the "soundness and the motive of the custodial parent's decision to relocate." The GAL stated it was clear that Mother was motivated by her better job prospects. Nevertheless, the GAL also said that it was a "question mark" as to whether Mother was motivated in part by a desire to get back with the ex-boyfriend who formerly lived with her, who was at that time living in California. He testified that "the move is based on mom's desire for a new job, period. The rest of it is really trying to rationalize whether that decision is in the best interest of the minor child."

The third factor was the availability of a reasonable alternative parenting schedule and whether Mother would comply with the parenting plan after moving. The GAL stated that Mother's proposed parenting plan "would devastate a relationship between Dad and the child," but he added, "The flip side is, how do you devastate something that may not be there right now?" Further, the GAL noted that Mother and Father had severe issues with exchanges and said, "if we're having exchanges here in Kansas City—issues—how are these exchanges going to happen when we're putting the child on a plane from California to Kansas or vice versa?"

The fourth factor was "what the detrimental effect of the move on a child and a noncustodial parent would be." The GAL stated that Father had recently taken steps to improve his relationship with S.B., but the GAL noted he was not sure if Father's efforts

8

were earnest and would continue, or if they were just reactionary because of Mother's motion to move S.B.

The fifth factor was "the dynamics of the parent-child relationship prior to the move." The GAL testified that according to Mother, Miranda, and S.B., S.B. had no real relationship with Father. Nevertheless, the GAL stated, "I've seen the child, in my visits, laying on Dad in my—in my lobby waiting to meet with me. Hugging, kissing each other. For them to have no connection, I don't see it." The GAL acknowledged that Mother had done most of the parenting, and Father "has not tried to be involved." The GAL stated that Father's lack of a relationship with S.B. was likely due in part both to his lack of desire and Mother's lack of support for the relationship. Ultimately, the GAL recommended that the court allow Mother to move with S.B., stating that it was a "55/45 type of decision" in favor of the move.

On February 7, 2018, the district court issued its decision. The district court wrote that it found Mother's testimony "was often not credible or persuasive" when she addressed the conflict between her and Father. It further wrote the following: "Contrary to mother's claim of being bullied, she has no problem standing up to father, communicates in a dictatorial manner and often manipulates scheduling and decision-making to father's detriment." Further, the court wrote, "Father's parenting role and record leaves much to be desired" because of Father's lack of involvement. Nevertheless, the court noted that Father seemed to be making efforts towards creating a stronger bond with S.B. Finally, the court noted, "Additionally and significantly, the GAL surreptitiously observed [S.B.] with father in his office waiting room. He told the Court that [S.B.] was 'all over him' with affection and that they obviously had a bond, even if not as close as with mother."

The district court ruled that Mother could not move S.B. to California. The district court gave nearly five pages of reasons for this ruling. In part, the court stated:

9

"While many of the above factors could be discussed in relation to the facts of this case, three factors weigh most heavily in the Court's decision: 1) mother's questionable motive in moving; 2) her history of thwarting father's relationship with [S.B.]; and 3) thus each parent's ability or willingness to respect and appreciate the bond between [S.B.] and the other and support that relationship in the future. The evidence relating to these three factors overlaps considerably but it all cuts against the proposed move being in [S.B.]'s best interest."

Mother timely appealed.

*Did the District Court Abuse Its Discretion by Deciding the Move Was Not in S.B.'s Best Interests?*

Our Supreme Court has frequently reiterated:

"'[w]hen the custody issue lies only between the parents, the paramount consideration of the court is the welfare and best interests of the child. The trial court is in the best position to make the inquiry and determination, and in the absence of abuse of sound judicial discretion, its judgment will not be disturbed on appeal. [Citations omitted.]'" *In re Marriage of Rayman,* 273 Kan. 996, 999, 47 P.3d 413 (2002) (quoting *In re Marriage of Whipp,* 265 Kan. 500, 506, 962 P.2d 1058 [1998]).

Abuse of discretion review therefore applies to the district court's denial of Mother's motion to move S.B. to California. When reviewing for abuse of discretion, this court will not disturb the district court's decision unless the decision is based on an error of law or fact, or if no reasonable person would agree with the decision. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). The party asserting an abuse of discretion bears the burden to show that the district court abused its discretion. *In re P.J.*, 56 Kan. App. 2d 461, 466, 430 P.3d 988 (2018).

10

Mother argues that the district court abused its discretion by applying the wrong legal standard. According to Mother, she "lost her motion principally because the court found that she committed a major transgression against [Father]'s rights as a father" by cohabitating with her ex-boyfriend and not telling Father about it. Mother argues that the district court did not conduct the appropriate best interests analysis, but rather "relied on its frustration with [Mother] as she co-parented with [Father]." This argument is flawed.

Under K.S.A. 2018 Supp. 23-3201, district courts shall "determine legal custody, residency and parenting time of a child in accordance with the best interests of the child." K.S.A. 2018 Supp. 23-3203 provides a nonexhaustive list of factors district courts shall consider when determining custody, residency, and parenting time. These factors include:

- "Each parent's role and involvement with the minor child before and after separation" K.S.A. 2018 Supp. 23-3203(a)(1);
- "the emotional and physical needs of the child" K.S.A. 2018 Supp. 23-3203(a)(5);
- "the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent" K.S.A. 2018 Supp. 23-3203(a)(8); and
- "the ability of the parties to communicate, cooperate and manage parental duties" K.S.A. 2018 Supp. 23-3203(a)(10).

Here, both Mother and Father sought to amend the existing parenting plan. Father wanted to amend the plan to give him more parenting time; Mother wanted to amend the plan so that she could move S.B. to California. The district court denied Mother's motion to move S.B., but it did modify the parenting plan.

As pointed out earlier, the list of factors used to determine a child's best interests is nonexhaustive. See K.S.A. 2018 Supp. 23-3203(a). Further, under K.S.A. 2018 Supp. 23-3222(c), the statute controlling changes in a child's residence states the following:

11

"In determining any motion seeking a modification of a prior order based on change of residence or removal as described in (a), *the court shall consider all factors the court deems appropriate including, but not limited to:* (1) The effect of the move on the best interests of the child; (2) the effect of the move on any party having rights granted under this article; and (3) the increased cost the move will impose on any party seeking to exercise rights granted under this article." (Emphasis added).

Thus, both best interests analysis under K.S.A. 2018 Supp. 23-3203 and the relocation analysis under K.S.A. 2018 Supp. 23-3222(c) are nonexhaustive and the district court can correctly consider all "appropriate" factors when conducting these analyses.

Here, the district court spent seven pages explaining the applicable law, treatises, and model statutes it relied on to reach its conclusions. The district court correctly identified K.S.A. 2018 Supp. 23-3201 et seq. as the controlling child custody statutes. The district court also looked to the American Academy of Matrimonial Lawyers' model relocation statute and the American Bar Association's Family Law Section model Relocation Act. The district court then laid out 16 conclusions. The conclusions included:

"46. However all cases are highly dependent on their individual facts. While many of the above factors could be discussed in relation to the facts of this case, three factors weigh most heavily in the Court's decision: 1) mother's questionable motive in moving; 2) her history of thwarting father's relationship with [S.B.]; and 3) thus each parent's ability or willingness to respect and appreciate the bond between [S.B.] and the other and support that relationship in the future. The evidence relating to these factors overlaps considerably but it all cuts against the proposed move being in [S.B.]'s best interest.

. . . .

"55. Mother's primary motive in moving as it relates to the minor child, is to get herself and [S.B.] away from father. Mother thinks that 'all the back and forth' and [S.B.]'s anxiety over 'transitions' are bad for her. She thinks that these will interfere with [S.B.]'s schooling in the future; that she won't have enough time to get her

12

homework done. Mother did not articulate how attending school from two parents' homes will be different or more difficult for [S.B.] than other children of divorced parents. She just does not seem able to envision father as playing a role in [S.B.]'s childhood education. Generally, mother does not believe father knows how to take care of [S.B.]. She testified that [S.B.] came back from a trip with father rubbing her genital area and having nightmares (although she never discussed this with him). Mother testified that [S.B.] 'dreads' going to her father's house. She testified that after parenting time with father [S.B.] struggles emotionally at school; that she is withdrawn and tired. She blames [S.B.]'s two low test scores of 80% and 83% on time with father. She does not think father can prepare [S.B.]'s schoolwork or backpack for her. She claims that father does not bathe [S.B.] and that she returns from his house unkempt and wearing dirty clothes; that she is 'pretty suffering' after a night at father's. She does not believe father knows to put warm clothes or a coat on [S.B.] in colder weather. She believes that being away from the stress of parenting time with father for extended periods of time is the only thing that will clear up [S.B.]'s eczema.

"56. The Court does not find valid evidence that much, if any of this is true or valid, except that [S.B.] experiences some anxiety over parenting time with father. The Court believes this is more accurately described as anxiety over the dysfunction and exchanges between her high conflict parents and her preference for time at mother's house. The Court does not doubt that [S.B.] is fully aware that her mother does not want her to spend time with father. Also that mother does not believe she will be safe or well cared for with him. She knows her grandparents physically carried her away from her father when he tried to pick her up at school for a weekend trip. She knows she is not allowed to take her backpack or her things to father's house or even wear her clothes there. Mother's contempt for father is palpable. She more than implied in testimony that father's negligent medical care of his own father contributed to his death. When asked directly, she could not testify that he is a loving father. Mother does not really want [S.B.] to believe that father is loving or competent either. Her testimony to the contrary is merely lip service.

"57. Because mother believes that time with father is against [S.B.]'s best interests, she has made numerous attempts to thwart father's parenting time, some of which are mentioned above. Additionally, she has significantly undermined father's role in [S.B.]'s life both through her attitude toward him and introducing another father

13

figure into [S.B.]'s life without father's knowledge. On two occasions she combined the two and deceptively interfered with father's parenting time so [S.B.] could do an activity with [Mother's ex-boyfriend]."

Mother is correct that the district court did discuss Mother's cohabitation with her ex-boyfriend and the fact that she lied to Father about it. Mother is incorrect, however, that this constituted application of an incorrect legal standard. Indeed, the court itself stated that the three primary reasons animating its order were "(1) mother's questionable motive in moving; (2) her history of thwarting father's relationship with [S.B.]; and (3) thus each parent's ability or willingness to respect and appreciate the bond between [S.B.] and the other and support that relationship in the future."

In context, it is clear that the district court brought up the ex-boyfriend as an example of Mother withholding from Father material information about S.B.'s life and wellbeing. The court found that Mother allowed an unrelated man to live in her house with S.B., and lied to Father about it. When S.B. told Father about the man and Father asked Mother directly about the man, Mother misrepresented the truth by saying the man was a "helper." The district court here reasonably concluded that this behavior demonstrated an unwillingness on Mother's part to cooperate in coparenting S.B. with Father, and Mother's desire to obstruct Father's coparenting rights.

The district court also cited the issue as an example of Mother's lack of credibility. In doing so, the district court ultimately concluded: "The Court cannot conclude that [the ex-boyfriend] plays a role in mother's proposed move. The Court does conclude that mother is not credible when discussing the purchase of her house or her relationship with [the ex-boyfriend]."

District courts are uniquely positioned to assess a witness' credibility because they are privy to the witness' demeanor at trial. As with any credibility assessment, a district

14

court judge must weigh surrounding facts and circumstances along with a witness' testimony. This weighing of the evidence process is something district judges frequently must do. Thus, appellate courts do not reweigh evidence or reassess a witness' credibility. *Griffin v. Dale Willey Pontiac-Cadillac-GMC Truck, Inc.*, 268 Kan. 33, 34, 991 P.2d 406 (1999). Here, the district judge concluded that Mother's testimony about S.B.'s best interests was not credible. As a result, this court cannot reweigh or reassess the district judge's credibility determination.

Finally, Mother makes a large point of the fact that the district court wrote that its "standard parenting plan orders in all cases include a prohibition against another adult moving into a child's home without 30 days' notice to the other parent, including the person's identity, birthdate and social security number." Mother is correct that S.B.'s parenting plan imposed no such requirement. Nevertheless, the district court was not penalizing Mother for violating a clause that did not exist, as she claims on appeal. Instead, it stated that it includes this requirement in nearly all parenting orders in order to demonstrate how important it is that a parent have knowledge of other adults living with his or her child. This is a common sense requirement insofar as a child's safety and wellbeing is concerned.

Mother has not satisfied her burden to show that the district court used an erroneous legal standard. The district court's consideration of her cohabitation with her ex-boyfriend was not application of an erroneous legal standard but, instead, the court giving an example of Mother's failure to "respect and appreciate the bond between child and the other parent and to allow for a continuing relationship between the child and the other parent." This is one of the statutory factors listed in K.S.A. 2018 Supp. 23-3203(a). Further, because a district court shall "consider all factors the court deems appropriate" when ruling on a motion to relocate a child, the district court here did not err by considering Mother's decision to let her ex-boyfriend live in her home with S.B. for a year and lie about it to Father. See K.S.A. 2018 Supp. 23-3222(c).

15

*Did the District Court Err by Allowing the GAL to Act as a Witness?*

Mother originally raised both issues relating to the GAL as a single argument on appeal. As Father correctly identified, these are separate issues subject to separate analysis. In her reply brief, Mother agrees that these are separate issues. The first GAL argument that Mother raises is that the district court erred by allowing the GAL "to act as a witness." We consider this argument waived because Mother failed to adequately brief this issue.

The only relevant portion of Mother's brief states:

"We do have evidence that the court considered statements by the GAL as testimony from the GAL when it relied on the GAL. In one of the few points, the court coined as significant: 'Additionally and significantly, the GAL surreptitiously observed [S.B.] with father in his office waiting room. He told the Court that [S.B.] was 'all over him' with affection and that they obviously had a bond, even if not as close as with mother.' (R. Vol. l, p. 180.)

"It was these observations that supported Rajat's claims: 'The Court finds from the evidence and/or observations of the GAL that all of father's above allegations are essentially true, as discussed in more detail below.' (R. Vol. l, p. 171, ¶ 7.) This undoubtedly is the court accepting the GAL's statements as evidence, not as a recommendation."

In her brief, Mother failed to argue how this statement was error and provided no authority to support her assertion that the statements constituted error. Additionally, Mother failed to explain how the GAL's conduct resulted in prejudice to her; indeed, the GAL ultimately recommended in favor of Mother's motion to relocate to California. Although Mother later tried to substantively argue the issue in her reply brief, this is insufficient to preserve the issue for our review. See *Sierra Club v. Mosier*, 305 Kan.

16

1090, 1134, 391 P.3d 667 (2017) ("'An appellant may not raise new issues in a reply brief.'"). Accordingly, we do not reach this issue on the merits.

*Does the District Court's Order That the Parents Waive Ex Parte Contact Between the Court and the GAL Constitute Judicial Misconduct?*

Mother's second GAL argument is that the district court erred by including in the order appointing a GAL a clause that stated both parties waived any objection to ex parte contact between the court and the GAL. The challenged clause reads as follows: "The parties agree to waive any ex-parte communications between the Guardian Ad Litem and the Court. Counsel for the parties agrees to allow the Guardian Ad Litem to have direct contact/communications with their client(s)."

Mother admits that the order she challenges was issued on March 8, 2017, nearly a year before her appeal in this case. She admits that she did not timely object to the ordered waiver. Mother also admits that "there is no evidence in the record that the 'waiver' ever resulted in ex parte communications" but, she argues, "the order created the appearance of impropriety."

Nevertheless, Mother plainly admits that there is no evidence in the record that any ex parte communications transpired between the GAL and the district court. Thus, Mother has failed to show prejudice of her substantial rights. As a result, we reject this argument.

*Attorney fees*

After oral arguments in this case, both Mother and Father moved for attorney fees under Supreme Court Rule 7.07 (2019 Kan. S. Ct. R. 50). Both parties note that under Supreme Court Rule 7.07(b)(1) and K.S.A. 2018 Supp. 23-2715, this court has the ability

17

to award attorney fees "as justice and equity require." K.S.A. 2018 Supp. 23-2715. Neither party here makes a compelling case that "justice and equity" require an award of fees in this case.

Mother makes no arguments about justice and equity. Additionally, this court is generally hesitant to award attorney fees to a party that does not fully prevail on appeal. *Richardson v. Murray*, 54 Kan. App. 2d 571, 588, 402 P.3d 588 (2017), *rev. denied* 307 Kan. 988 (2018).

Father argues that "a substantial portion" of his appellate fees were caused by Mother's requests to modify the record and request for oral argument. Review of his attorney fee affidavits shows that only a few hours were explicitly identified as spent on dealing with "exhibit issues" or "retriev[ing] exhibits." This does not strike us a significant hardship or unusual demand beyond the scope of typical appellate practice. Thus, we do not find that justice and equity require an award of attorney fees for Father.

Accordingly, both Mother's and Father's requests for attorney fees are denied.

Affirmed.